IRVING, J.,
for the Court.
¶ 1. Jaison Harness was convicted in the Hinds County Circuit Court of aggravated driving under the influence and sentenced to serve a term of twenty-five years, with ten years suspended and five years of supervised probation, in the custody of the Mississippi Department of Corrections.
¶ 2. Aggrieved, Harness appeals and asserts the following issues, which we quote verbatim:
(1) The trial court erred when it admitted the testimony of Joseph Cotten as an accident reconstructionist because Cotten failed to qualify as an expert under Mississippi Rule of Evidence 702; thus, the substantial right of Mr. Harness to a fundamentally fair trial was fatally compromised;
*14 (2) The trial court abused its discretion when it admitted into evidence a diagram by Joseph Cotten as it was an incorrect and incomplete depiction of the accident scene, irrelevant, confusing to the jury and prejudicial to a fair hearing of the cause against Mr. Harness;
(3) The trial court erred in denial of the Motion to Dismiss and Motion to Suppress due to the destruction of blood drawn from Mr. Harness; destruction of this crucial evidence deprived him of his fundamental rights to due process of law and to confront evidence mounted against him under Amends. V, VI, XIV, U.S. Const, and Art. Ill, §§ 14, 26, Miss. Const.;
(4) The State failed to establish an adequate evidentiary foundation to admit evidence of a blood sample allegedly drawn from Mr. Harness. The trial court further erred when it held Miss. R. Evid. 803(5) applied to permit presentation of otherwise inadmissible evidence to the jury; and
(5) The trial court violated the fundamental right of Mr. Harness to mount a defense when it denied admission of the release and settlement he received from [Clyde] Hampton’s insurer and evidence of a complaint filed against him alleging the negligence of a second, unknown individual.
¶ 3. Finding no reversible error, we affirm.
FACTS
¶ 4. Clyde Hampton died as a result of injuries that he suffered in a head-on collision on August 22, 2003, when a vehicle driven by Harness collided with his vehicle. The vehicles were traveling on Wes-thaven Boulevard in Hinds County when the accident occurred. Harness was indicted for, and found guilty of, aggravated DUI.
¶ 5. During Harness’s trial, Bobbie Moore testified that on August 22, 2003, around 11:30 p.m., she was traveling in the southbound lane of Westhaven Boulevard in Hinds County and that Hampton was also traveling southbound in a white GMC truck approximately six car lengths behind her. Moore said that as she proceeded along Westhaven Boulevard, she saw a blue Mercury traveling toward her in the northbound lane. The Mercury was being driven by Harness. Moore further testified that Harness’s car drifted over the yellow line in the center of the road, causing her to veer off the road to avoid being hit. According to Moore, after she got back on the road, she became concerned for Hampton in the vehicle behind her, so she looked in her rearview mirror. At that point, she saw Harness’s car and Hampton’s truck collide head-on in Hampton’s lane.
¶ 6. The police department, fire department, and an ambulance responded to the scene. Officer Natyyo Gray testified that when he arrived, he saw Harness standing by his car and saw Hampton in the driver’s seat of his truck, appearing “lifeless.” Officer Gray stated that after Harness gave him his driver’s license and proof of insurance, Harness then informed the officer that he had just left a social function. Although Harness admitted that he had been drinking, he stated that he was not drunk. Officer Gray further stated that he walked around Harness’s car and found an unopened bottle of brandy on the passenger floorboard.
¶ 7. Around midnight, Officer Joseph Cotten, an accident reconstructionist with the Jackson Police Department, arrived at the scene. Officer Cotten testified that he made markings at the scene to preserve each vehicle’s final resting place. Officer *15 Cotten also testified that in the early morning hours of August 28, he went to the Baptist Hospital to visit Hampton who was unconscious. He stated that he smelled alcohol on Hampton’s breath, prompting him to request a blood sample. Officer Cotten stated that he provided a blood alcohol-kit to be utilized by the nurse in drawing the sample. According to Officer Cotten, he recovered the kit from the nurse, labeled it, sealed it, and later placed it into the evidence locker at the precinct.[1]
¶ 8. Officer Cotten stated that after he left Hampton around 2:30 a.m., he went to the Central Mississippi Medical Center to visit Harness. He stated that Harness was semiconscious and that “he was in and out, I couldn’t understand what he was saying.” Officer Cotten further stated that, as was the case with Hampton, he also smelled alcohol on Harness and requested that a blood sample be drawn from Harness.[2] Officer Cotten testified that he saw Nurse Noreen Kenny when she drew the blood sample from Harness around 3:25 a.m. and transferred it into the blood-sample kit that he had provided for her. Officer Cotten also labeled this kit, sealed it, and later placed it into the evidence locker.[3]
ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 9. Although he argues several points of error, Harness’s central argument is that the trial court erred in allowing certain pieces of evidence and expert testimony to be admitted. It is well settled that the standard of review for the trial court’s admission of evidence is abuse of discretion. Delashmit v. State, 991 So.2d 1215, 1218(119) (Miss.2008) (citing Debrow v. State, 972 So.2d 550, 552(¶ 6) (Miss.2007)). However, when a question of law is raised, the applicable standard of review is de novo. Id. “A case may be reversed based on the admission of evidence if the admission results ‘in prejudice and harm’ or adversely affects a substantial right of a party.” Smith v. State, 839 So.2d 489, 495(¶ 8) (Miss.2003) (quoting Farris v. State, 764 So.2d 411, 428(¶ 57) (Miss.2000)).

1. Expert Testimony

¶ 10. Harness argues that the trial court erred when it admitted the testimony of Officer Cotten as an accident recon-structionist because Officer Cotten had not completed the academic requirements at the time of the accident to qualify as an expert under Rule 702 of the Mississippi Rules of Evidence. In Harness’s view, this lack of academic credentials resulted in Officer Cotten’s testimony being irrelevant and unreliable.[4] He further asserts: “the fact that the trial court sanctioned a clearly unqualified individual as an expert witness lent undue weight to his testimony in [Officer Cotten’s] customary role as [lead] investigator.”
¶ 11. Officer Cotten testified that the academic requirements for becoming a certified accident reconstructionist required three levels of training and a two-day state certification exam. Officer Cotten completed the first level of training in April *16 2003 and the second level in May 2003. The third level of training covered momentum. Officer Cotten completed this level in October 2003 and became fully certified as an accident reconstructionist in January 2004. On the night of the accident, Officer Cotten used the methods that he had learned in the first two levels of his certification training. Only after completing the third level of training did he use the information that he had gathered from the accident scene to do an in-line momentum test. Officer Cotten completed the accident reconstruction report in November 2003, one month after he had completed all course requirements to be certified as an accident reconstructionist.
¶ 12. Rule 702 of the Mississippi Rules of Evidence states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
¶ 13. As shown, Officer Cotten did not possess all of the skills of an accident reconstructionist on the date of the accident. He had only completed two of the three certification courses. However, he utilized the skills he had acquired up to the date of the accident to make his initial findings and finished the report only after he had acquired skills from the final course. In finding that Officer Cotten was qualified to give expert testimony, the trial court stated in pertinent part:
Subsequent to this collision the witness completed levels two and three of his training as an accident reconstructionist [5] and upon completion of that training and being certified by the State of Mississippi as an accident reconstructionist the Court is of the opinion that the witness possesses the necessary knowledge, training, and skill to testify as an accident reconstructionist in all areas within that field which would include conclusions or opinions concerning momentum and speed.
As of the time of the collision the officer did not possess that knowledge, training or education. However, the Court is of the opinion that there is no reason that once obtaining that specialized knowledge, training, and education that the witness could not go back, as he did, and review the data collected during the course of his investigation and from that data, photographs, and other evidence, form a reliable opinion concerning momentum and speed and other matters that fall within the realm of being an accident reconstruction expert.
(Footnote added).
¶ 14. By the time of the trial, Officer Cotten had reconstructed seventy-two automobile accidents. Applying the standards of Rule 702 and our well-settled standard of review, we cannot conclude that the trial court abused its discretion or that its decision to accept Officer Cotten as an expert witness was an abuse of discretion. Therefore, this contention of error is without merit.

*17
2. Diagram

¶ 15. Next, Harness argues that the trial court abused its discretion when it admitted into evidence a “not-to-scale” diagram created by Officer Cotten. Harness argues that the diagram was irrelevant and that he was prejudiced when it was admitted into evidence because the diagram was inaccurate as to the placement of the vehicles.
¶ 16. During trial, the State explained to the court that the diagram was not to scale. In fact, the diagram had the words “not to scale” written on it. The State further explained that the “diagram is a composite of the matters that are set out in individual places in the photographs.” According to the State, the purpose of the diagram was to give the jury meaning to the measurements that were taken by Officer Cotten.
¶ 17. In allowing the diagram into evidence, the trial court stated:
As long as the witness’s and, as I understand it, the witness’s opinion testimony or conclusions or findings are going to be based on the actual measurements taken as shown in the photographs are of those things that are shown in the photographs, being the placement of the automobiles, the location on the road, the gouge marks and so forth, as I understand both [the] prosecution and [the] defense, this drawing is going to be for demonstrative purposes.
⅜ ⅜ ⅜ ⅝ ⅜ ⅜
As long as his opinion is not predicated on matters in the drawing and it’s based on firsthand observations, measurements taken and things as shown in the photographs, I’ll allow the drawing to be used as a demonstrative exhibit.
If, however, it becomes [evident] that the witness is basing his opinion on the drawing itself, as [defense counsel] has pointed out, it doesn’t take much comparing the photographs of the vehicle with the drawing to see that the placement of the defendant’s car is not the same.
If we have a situation that the basis of his opinion is based on something that’s clearly factually in error, then I’m going to strike his opinion entirely.
¶ 18. We find that the trial court did not abuse its discretion in admitting the diagram, as the trial court was clear that the drawing was only allowed for demonstrative purposes and that Officer Cotten’s conclusions could only be based on the photographs which depicted the actual placement of the vehicles. Therefore, this contention of error is also without merit.

3. Motion to Dismiss and Motion to Suppress

¶ 19. On July 22, 2004, Harness filed a motion for discovery, requesting that the State produce for independent testing a sample of his blood that was utilized to determine his blood-alcohol content. The State did not respond to the discovery request. Accordingly, on September 30, 2004, Harness filed a motion to compel, and a hearing was set for November 8, 2004. However, at the hearing, it was revealed that, unbeknownst to the State and to Harness, the sample had been destroyed by the crime lab on October 7, 2004.
¶20. Stevenson testified that neither the district attorney’s office nor anyone representing Harness contacted the crime lab about the sample before it was destroyed. According to Stevenson, samples are routinely disposed of six months after the analyses are completed. The crime lab’s report was completed on October 24, 2003, and forwarded to the State. The report contained the following language:
*18 This report represents the analytical results of the examinations performed on the items of evidence in this case. It should be noted that this report does not represent all documentary items contained in the master file. Should additional material be required for court purposes, please contact the laboratory as soon as possible. All samples submitted for toxicological examinations will be routinely disposed of six months after analyses are completed. If you anticipate that this evidence will be needed, please contact the laboratory to arrange its return.
(Emphasis added). At the conclusion of the hearing, the trial court denied Harness’s motion.
¶ 21. Harness asserts that the trial court erred in denying this motion to dismiss and his motion to suppress because the destruction of his blood sample deprived him of due process and of the right to confront the evidence against him. He cites California v. Trombetta, 467 U.S. 479, 488, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) for the proposition that the prosecution is under a duty to preserve evidence expected to play a determinative role in the defense of the criminally accused. He states that in order to determine whether the fundamental rights of a defendant to a fair trial have been fatally prejudiced by the prosecution’s destruction of evidence, a reviewing court must engage in a two-prong test. First, the “evidence must possess an exculpatory value that was apparent before the evidence was destroyed.” Id. at 489, 104 S.Ct. 2528. Second, “[the evidence must] be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.” Id.
¶ 22. We agree that Harness has stated the correct test. However, we find that Harness cannot meet the first prong of the test — that the evidence was apparently exculpatory. The lowest test results of Harness’s blood-alcohol level was 0.1170, which is well over the legal limit. Therefore, it cannot be legitimately argued that the State acted in bad faith in destroying Harness’s blood sample since there was nothing exculpatory about the sample. Because Harness fails to meet the first prong of Trombetta, there is no need for us to consider the second prong. We may add as a point of interest, however, that Harness’s attorney repeatedly stated during the motion hearing that he did not believe that the evidence was destroyed intentionally. Therefore, this contention of error is without merit.
A Foundation for Admission of Blood Sample
¶ 23. Next, Harness contends that the State failed to establish the proper foundation for admission of his blood sample into evidence. Specifically, Harness argues that there was a lack of foundation because Nurse Kenny, who allegedly drew the blood, testified that she did not recall seeing Harness or Officer Cotten, nor did she remember the morning of August 23, 2003. Most importantly, however, Harness points out that Nurse Kenny did not remember complying with the request of Officer Cotten to draw a blood sample from Harness.
¶ 24. Harness is correct in his contention that Nurse Kenny did not have an independent recollection of the events surrounding her drawing of his blood on August 23, 2003. However, Officer Cotten testified that he completed the law enforcement official’s portion of the department’s standard form for a blood draw in DUI cases and, thereafter, tendered the form to Nurse Kenny. He also testified that he observed Nurse Kenny complete the portion of the form that is required to *19 be completed by the medical official who draws the blood sample. He also observed her while she drew the blood. As stated, Nurse Kenny did not remember the specific event. However, she testified that the form bore her signature and that she would have signed it on the day that is reflected on the form because that was her normal practice. She further testified that she would not have signed the form attesting to certain matters reflected on the form unless she had in fact done or performed those matters as reflected. Thereafter, the court allowed Nurse Kenny to read the contents of the form pursuant to the authority of Rule 803(5) of the Mississippi Rules of Evidence, which states:
A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence, but may not itself be received as an exhibit unless offered by an adverse party.
¶ 25. We note that the comment to Rule 803(5) provides that before this hearsay exception can be utilized, there must be a “preliminary showing that the witnesses] memory is exhausted to the extent that he is unable to testify fully and accurately.” M.R.E. 803(5) cmt. It is clear in this record that Nurse Kenny’s memory was completely exhausted and that she was unable to testify in any respect regarding the drawing of Harness’s blood. Therefore, we find that the trial court did not err in finding that a proper evidentiary foundation had been laid when it allowed Nurse Kenny to read from the form as authorized by Rule 803(5). Accordingly, this contention of error is without merit.

5. Release, Settlement, and Complaint

¶ 26. Lastly, Harness contends that the trial court violated his fundamental right to mount a defense when it refused to allow him to present information about a release and settlement that he received from Hampton’s insurer. He also claims that the trial court committed additional error by refusing to allow a complaint that allegedly was filed against him by Hampton’s heirs to be admitted into evidence. Apparently the complaint, in addition to alleging negligence on the part of Harness, alleged that a second, unknown individual was also negligent. As to the release and settlement, Harness contends that he should have been allowed to testify that he received a fifty-thousand-dollar settlement check from Hampton’s insurance company and that the insurance company’s representative informed him that the company was paying the money because it had determined that Hampton was at fault in causing the accident.
¶ 27. The trial court found that Harness’s proposed testimony was irrelevant, hearsay, and prohibited by Rule 408 of the Mississippi Rules of Evidence and that the complaint did not disprove Harness’s negligence. Therefore, the court found that the complaint was also irrelevant.
¶ 28. In his brief, Harness argues that Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) stands for the proposition or principle “that substantive constitutional concerns must have sway over procedure when the issue is a fundamental constitutional right, such as the right to mount a defense.” In Crane, the trial court determined that once a confession has been found voluntary, the evidence that supported that finding may not be presented to the jury for any other purpose. Id. at 687, 106 S.Ct. 2142. The Supreme Court found that the lower *20 court’s decision “[rested] on the apparent assumption that evidence bearing on the voluntariness of a confession and evidence bearing on its credibility fall in conceptually distinct and mutually exclusive categories.” Id. In reversing the lower court on this issue, the Supreme Court stated:
Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants “a meaningful opportunity to present a complete defense.” (“The Constitution guarantees a fair trial largely through the several provisions of the Sixth Amendment”). We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard. That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant’s claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor’s case encounter and “survive the crucible of meaningful adversarial testing.”
Id. at 690-91, 106 S.Ct. 2142 (internal citations omitted).
¶ 29. We find nothing in Crane that requires admission of the evidence that the trial court excluded. It is axiomatic in American jurisprudence, and well established by our rules of evidence, that only relevant evidence is admissible in a court of law.
¶ 30. Here, the trial court noted that although the complaint alleged that another individual contributed to the accident, it also made factual allegations of negligence against Harness. The trial court stated that the complaint was irrelevant because “the fact that another defendant, another person, may have contributed to the accident would not relieve Mr. Harness of any criminal liability for which a jury would [sic] otherwise find.” In addition to the reasoning articulated by the trial court, we note that a civil complaint is nothing more than the pleader’s version of a set of facts and the legal consequences flowing therefrom, which the pleader hopes to prove. It neither adjudicates nor proves anything. The complaint could not assist the jury in determining whether, on the night of August 22, 2003, Harness negligently caused or contributed to Hampton’s death. In Holliday v. State, 418 So.2d 69, 71 (Miss.1982) (quoting Schroer v. State, 250 Miss. 84, 91, 160 So.2d 681, 684 (1964)) (internal citation omitted), our supreme court stated:
The unlawful act or omission of accused need not be the sole cause of death. The test of responsibility is whether the act of accused contributed to the death, and, if it did, he is not relieved of responsibility by the fact that other causes also contributed. Moreover, responsibility also attaches where the injury materially accelerates the death, although the death is proximately occasioned by a preexisting cause.
Therefore, since the complaint could not assist the jury in answering the sole question that Holliday requires must be answered, we agree with the trial court that it was irrelevant.
¶ 31. We also agree with the trial court that any documentation regarding the settlement and release in the civil lawsuit is likewise irrelevant. As stated, the trial court determined that admission of the information was also prohibited by Rule 408 of the Mississippi Rules of Evidence, which provides in pertinent part:
*21 Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.
(Emphasis added). The comment provides the justification for the rule, stating: “The rule is based on two reasons. First, the evidence is irrelevant, since the offer may be motivated by a desire for peace rather than by a recognition of liability. Second, public policy favors out-of-court compromises and settlement of disputes.” M.R.E. 408 cmt.
¶32. We note that the rule is aimed primarily at information regarding settlement and negotiations in civil cases. This conclusion is borne out by the rule’s use of words and phrases such as amount, valuable consideration, claim, and invalidity of the claim-words and phrases that are not normally used in the adjudication of guilt in the criminal context. In a general sense, an indictment asserting that a defendant is guilty of a particular crime is a claim that he is guilty of that crime. Nevertheless, in the body of jurisprudence, we refer to the indictment as charging, not claiming, the defendant with a crime. Attempts to resolve the charges are not referred to as attempts at compromising the claim but are referred to as plea negotiations. In any event, proof that one’s actions do or do not give rise to civil liability neither proves nor negates criminal responsibility for those same actions. Therefore, whether Rule 408 was an appropriate vehicle upon which to deny admission of the information need not be decided, as the overarching point is that the decision refusing to allow admission of the evidence was proper, as the information is clearly irrelevant.
¶ 33. Finally, as to Harness’s claim that he should have been allowed to testify about what he was told as the reason for his being given the check, it is sufficient to say that any such testimony would have been hearsay, as it would have been offered in an effort to prove that Hampton’s negligence was the sole proximate cause of the accident. Harness has not pointed us to any exception to the hearsay rule which allows admission of this information. Therefore, we also find no error in the trial court’s ruling on this point. There is no merit to this issue, as well as to the other issues presented. The record reflects that Harness received a fair trial.
¶ 34. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY OF CONVICTION OF AGGRAVATED DUI AND SENTENCE OF TWENTY-FIVE YEARS, WITH TEN YEARS SUSPENDED AND FIVE YEARS OF SUPERVISED PROBATION, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. MAXWELL, J., NOT PARTICIPATING.

. John Stevenson, a forensic scientist with the state crime laboratory, testified that Hampton's blood-alcohol level was 0.03.

. Officer Cotten stated that he filled out the standard form which the department uses as authority for medical providers to obtain blood samples of persons involved in vehicular-homicide cases.

. The test revealed that Harness’s blood-alcohol-content level was 0.11.

. Officer Cotten testified that in his opinion, Harness’s vehicle was traveling sixty-seven miles per hour at the point of impact and was at least 5.1 feet over the centerline.

. As we have already noted, Officer Cotten completed level two before the accident. Therefore, the trial court was in error here.